**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11-20108-STA** |
| | ) | |
| **CHRISTOPHER YANCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Christopher Yancy's Motion to Suppress (D.E. # 23, 31, 41). The Court referred Defendant's Motion to the United States Magistrate Judge for report and recommendation. The Magistrate Judge has conducted two evidentiary hearings, reported his proposed findings of fact, and recommended that the Motion to Suppress be denied (D.E. # 56, 57). Defendant has filed timely objections to the Magistrate Judge's recommended legal conclusions (D.E. # 62). For the reasons set forth below, the report and recommendation is **ADOPTED**, and Defendant's Motion to Suppress is **DENIED**.

## BACKGROUND

The parties have not objected to the Magistrate Judge's report of the procedural background or proposed findings of facts in this matter. Therefore, the Court adopts the Magistrate Judge's report of the procedural background and proposed findings of fact as follows.

**I. Procedural Background**

On April 26, 2011, a federal grand jury returned a three-count indictment charging Defendant Christopher Yancy with "carjacking" in violation of 18 U.S.C. § 2119, using a firearm during and in relation to the carjacking offense, in violation of 18 U.S.C. § 924(c), and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). These charges stem from allegations that on the night of October 3, 2010, Defendant (along with another man named Orlando Potts) forcibly took a 1995 Nissan Pathfinder from Rodney Webster ("Webster"), by threatening Webster with a shotgun. Defendant allegedly used a blue shirt to cover his face and had a white sock over his hand as he handled the shotgun. Officers with the Memphis Police Department ("MPD") immediately canvassed the area and detained Defendant, Orlando Potts, and another man who was with Yancy and Potts. The officers presented the men one at a time to Webster for a "show-up" identification, and Webster identified Defendant and Potts as the carjackers. The officers seized evidence from the scene of the arrest, including a shotgun, a blue shirt, and a white sock. The officers also found in Defendant's pants pocket a set of keys which belonged to the stolen Pathfinder. A few hours later, Webster looked over photo spread line-ups and identified Defendant's photograph as depicting one of the perpetrators.

In his Motion to Suppress filed on October 6, 2011 (D.E. # 23), Defendant seeks to suppress the show-up identification as well as the photo spread identification made by Webster. Defendant also moves to suppress the car keys seized by the officers. The United States filed a response in opposition to the motion on November 1, 2011. Defendant then filed a Supplemental Motion to Suppress Evidence on November 7, 2011 (D.E. # 31), and the government filed a supplemental response on November 28, 2011.

On November 29, 2011, the Court held a suppression hearing. At the hearing, the

government offered testimony from Officer Lee Potts ("Officer Potts"), Officer Pierce Hayden ("Officer Hayden"), and Sergeant Marcus Frierson ("Sergeant Frierson") of the MPD; Officer Forrest Bartlett ("Officer Bartlett") of the Shelby County Sheriff's Office; and Webster, the victim of the carjacking. With leave of court, Defendant was permitted to file another supplemental brief on December 16, 2011 (D.E. # 41), to address the issue of whether the Court may consider independent, corroborative evidence of guilt in assessing the reliability of witness identifications. The government filed a supplemental reply brief on this limited issue on December 30, 2011.

Also on December 16, Defendant filed an unopposed Motion to Schedule Supplemental Hearing on Defendant's Motion to Suppress Evidence, in which he requested that the court schedule a second suppression hearing for the third week of January 2012. Defendant stated that his counsel had reviewed additional discovery materials provided by the government during the suppression hearing and listened to recordings of the 911 call and police radio communications relevant to this case. Defendant stated that additional testimony would be necessary to clarify the testimony provided by the officers at the November 29 hearing. The Court granted that motion, and on January 27, 2012, Officer Potts and Officer Bartlett were recalled as witnesses. The Court received additional evidence at the second hearing, including recordings of the 911 call and police radio communications from the night of Defendant's arrest. Based on the briefs filed in support of and in opposition to the Motion, the evidence presented at the hearings, and the applicable law, the Magistrate Judge recommended that Defendant's Motion be denied.

## II. Factual Background

After careful consideration of the testimony of all of the witnesses, including their demeanor as they testified at the hearings, the Magistrate Judge found that the officers and Webster were

credible. As a result, the Magistrate Judge adopted their version of events as his proposed findings of fact.

Approximately one week prior to October 3, 2010, Webster was out walking his dog in the morning at the Red Oaks apartment complex in Memphis, Tennessee. Webster had just been released from prison a couple of weeks earlier after having served time for a felony. He was staying with a friend, Marnisha Allen, in her apartment, which was located in an apartment complex across the street from the Red Oaks apartments. Since being released from prison, Wesbter had purposefully avoided having any contact with other men because, according to Webster, he thought avoiding other men would help him stay out of trouble. As he was walking his dog, another man – whom Webster had never met before but later identified as Defendant Christopher Yancy– asked Webster if he wanted to buy some stereo equipment. Webster told Defendant that he was not interested but agreed to accompany Defendant back to his apartment to look at the equipment, in case he knew of someone who might be interested in a stereo system. Webster and Defendant spoke for approximately ten to fifteen minutes. As Webster was talking to Defendant, he noticed that Defendant had a hump in his upper back. Webster then left Defendant's apartment.

On the night of October 3, 2010, Officer Potts of the MPD was on routine patrol in his police vehicle with a trainee, Officer Seth Joneas ("Officer Joneas"). At approximately 8:15 p.m., the MPD received a robbery complaint from an individual named Marilyn Johnson. Johnson informed the officers who had responded to the call that she had been robbed outside the McKellar Woods apartments, located on Airways Boulevard in Memphis.[1] She stated that as she exited her vehicle,

---

[1] The McKellar Woods apartment complex is also known as the Highland Meadows apartments.

she was held up by three black men in their early twenties with blue rags covering their faces and dark clothing. According to Johnson, one of the men was armed with a shotgun. Johnson informed the officers that the men took her purse and backpack and fled the scene on foot. A broadcast went out over the police radio regarding the robbery and providing the description of the suspects given by Johnson.

Officer Potts heard the description, and he and Officer Joneas canvassed the surrounding area in search of the suspects. While searching the area, Officer Potts drove past the Ayoka convenience store, located near the McKellar Woods apartments at the corner of Airways Boulevard and Wilson Road. Officer Potts saw two young men standing outside the store. At the time, Officer Potts had no reason to believe that these men were connected to the Johnson robbery. As Officer Potts pulled up to the store, one of the men ran away through a wooded "cut" pathway that led to the nearby Red Oaks apartments. Officer Potts spoke with the remaining man, later identified as Orlando Potts (no relation to Officer Potts), and told him that he could not loiter at the store. Orlando Potts left the store and walked through the cut toward the Red Oaks apartments.

At approximately 9:30 p.m. that night, Webster went to the Ayoka convenience store to purchase tobacco products. Webster arrived at the store in a 1995 Nissan Pathfinder, which he had borrowed from his friend Ms. Allen. As Webster exited the Pathfinder and walked toward the front entrance, he saw a young man standing outside the store wearing a blue hooded sweatshirt and blue jeans. The young man gave Webster a "peace" hand gesture. After completing his purchase, Webster left the store and went back to his vehicle. As he approached his vehicle, Webster heard a voice from behind telling him to turn around and step away from the vehicle. The man had a black shotgun with a white sock covering his hand. The man also had a blue shirt wrapped around his

head. Although Webster could only see the gunman's eyes, Webster recognized the man's voice as belonging to the man who had tried to sell him the stereo equipment a week earlier. The man told Webster to walk away from the vehicle toward the west side of the store. As Webster did so, the young man Webster had seen earlier standing outside the store stepped out of the bushes and joined the gunman. Webster was able to get a good look at the younger man because, at that point, the hood from his sweatshirt was down. The young man then pulled his sweatshirt up to cover his face. The gunman asked Webster whether he had any money. When Webster said no, he was told to take off his shoes and strip down to his underwear, hand over his car keys, and go through the cut to the Red Oaks apartments. The gunman told Webster that he would be shot if he did not comply.

Webster took off his clothes and shoes and ran to Ms. Allen's apartment. As he ran along Wilson Road, Webster saw the two carjackers drive past him in the Pathfinder. When he got to the apartment, he told Allen what had happened, at which time she called 911. Allen told the 911 operator that two black men had just stolen her gray Nissan Pathfinder from her friend, that one of the men had a shotgun, that both men had blue sweaters around their faces, and that the men were last seen heading westbound on Wilson Road toward Millbranch Road. The 911 operator broadcasted this information over the police radio.

Shortly after this broadcast, the operator made another broadcast based on a 911 call received from the owner of the Ayoka convenience store. The store owner reported that he had seen three black men outside of his store with light blue rags over their faces, one of whom was armed with a shotgun. The owner stated that he believed the men were going to rob his store. Several MPD officers, including Officer Potts, immediately responded to these broadcasts by canvassing the area. They also sought additional information from the operator about the direction that the carjackers

were headed and the Pathfinder's license plate number.[2]  Officer Hayden along with other MPD officers went to Ms. Allen's apartment to interview Webster.

As Officers Potts and Joneas were driving through the Red Oaks apartments looking for the suspects, they saw three black males, later identified as Defendant, Orlando Potts, and Dewayne Johnson, walking northbound.  Although it was dark outside, the area was well lit, which enabled the officers to clearly see the three men.  As their police vehicle approached the three men from behind, Officer Potts saw Orlando Potts holding a shotgun, which he then tossed into some nearby bushes.  Officer Potts witnessed Defendant throw a blue shirt and Johnson throw another object, which was later discovered to be a white sock.  Officer Potts radioed to the dispatcher that he spotted the three suspects and stated "we got the shotgun."  Officers Potts and Joneas exited their vehicle with their weapons drawn, ordered the three men to the ground, and placed them in handcuffs.  The three men were detained and searched.  During the search, one of the officers removed a set of car keys from Defendant's pants pocket, which was taken and placed on the back of Officer Potts's police car.

Meanwhile, Officer Hayden interviewed Webster at Ms. Allen's apartment and obtained a more detailed description of the carjackers.  Webster stated that the younger man was in his twenties with a dark complexion, stood about 5'5" tall, weighed about 140 pounds, and had on a blue "hoodie" and blue jeans.  Webster said the gunman was approximately 6'0" tall, weighed about 170 pounds, had a blue shirt over his face, and was armed with a shotgun.  Webster stated that the gunman was the same man who had approached him a week earlier, because he recognized his voice

---

[2] Although it appears that the Ayoka store attempted robbery occurred sometime prior to the Webster carjacking, the recordings of the police radio communications indicate that the 911 broadcast on the Webster carjacking went out before the broadcast of the attempted robbery.

and the hump in his back.[3]  Officer Hayden broadcasted these descriptions of the carjackers over the police radio.[4]  Officer Potts responded to the broadcast and informed Officer Hayden that he had individuals matching the descriptions in custody.

Officer Hayden then brought Webster to Officer Potts's location to conduct a show-up identification.  The show-up identification occurred approximately one hour after the carjacking.  Webster was shown the shotgun, the blue shirt, and white sock on the ground, which he identified as the same items used in the carjacking.  Webster was then placed in the backseat of Officer Hayden's car as Defendant, Orlando Potts, and Johnson were each escorted, one at a time, toward Officer Hayden's rear window.  Webster did not recognize Johnson, who was the first suspect shown to him.  Webster identified Orlando Potts and Defendant, the second and third suspects shown to him, respectively, as the two men who had carjacked him.  After the show-up, Webster described the keys that had been taken from him during the carjacking.  One of the officers took the set of keys that had been recovered from Defendant's pants pocket and showed them to Webster.  He confirmed that the keys belonged to the stolen Pathfinder.  Officers later found the Pathfinder parked on a nearby street.

After completing the show-up identification, Webster was taken to the police station to

_____

[3] Webster testified that Defendant was the only male he had any conversations with between the time Webster was released from prison to the time he was carjacked.

[4] Officer Potts provided conflicting testimony at the November 29 and January 27 suppression hearings regarding the timing of when he heard the description of the carjackers and when he detained the three suspects.  The conflicting testimony can be explained by the confusion resulting from the multiple 911 calls broadcast that evening during a very short period of time.  The recordings admitted into evidence at the hearing demonstrate that Officer Potts received and responded to the 911 operator's initial broadcast of the Webster carjacking before he saw the three suspects in the Red Oaks apartments.  After the suspects were detained, Officer Potts received Officer Hayden's broadcast of the carjackers' physical descriptions.

provide a statement. While at the station, at approximately 2:00 a.m., Sergeant Frierson showed Webster a photo spread lineup comprised of six photographs, one of which was Defendant's. The other photographs were gathered by Sergeant Frierson from a computer database and depicted individuals of similar skin color and age and who also wore red shirts like the one Defendant was wearing when he was arrested and photographed. Due to an oversight, two of the photographs were of the same individual (not Defendant), although one photograph was noticeably darker than the other. Prior to showing Webster the photo spread, Sergeant Frierson provided him with a document titled Advice to Witness Viewing Photographic Display, which described the photo spread identification process and which Webster signed and dated.[5] Webster circled the photograph of Defendant without hesitation and wrote at the bottom of the photo spread, "This is the guy that robbed me. I meant [sic] him about a week ago. I reconized [sic] his voice." Subsequently, Webster was presented with a second photo spread with six photographs, one of which was of Johnson. Webster did not identify any of the photographs in the second photo spread. At the police station,

---

[5] The form provided in part as follows:

1. The photographic display will contain pictures of persons of similar descriptions in similar poses.

2. There is no significance to the order in which the photos appear.

3. The person pictured may or may not have anything to do with the suspect offense and I am not to assume that the guilty party must be one of the persons represented.

4. During the interviewed [sic] process, no one is to give me any hints or suggestions or attempt to influence my identification in any way.

5. If I make an identification, it will be done in writing.

6. I am to make no identification unless I am positive of such identification.

Defendant, Orlando Potts, and Johnson were all advised of their Miranda rights. Yancy refused to give a statement. Orlando Potts and Johnson waived their Miranda rights and gave signed confessions in which they identified Defendant as the gunman and Orlando Potts as his accomplice in the Webster carjacking.

In his Motion to Suppress, Defendant claims that the car keys seized from his pants pocket should be suppressed, because the officers did not have probable cause to arrest him and therefore were not authorized to search him incident to arrest.[6] He also contends that, even if the officers possessed reasonable suspicion that he had committed a crime and was armed and dangerous, the officers were not authorized to seize the keys because the keys did not resemble a weapon which might be used to assault the officers. Yancy further argues that the show-up identification conducted by the officers at the scene of the arrest was unduly suggestive and that Webster's identification was unreliable. Similarly, Yancy argues that the photo spread lineup and identification were unduly suggestive and unreliable.

In his Report and Recommendation, the Magistrate Judge concluded that Defendant's Motion to Suppress should be denied. First, the Magistrate Judge reasoned that the officers did not violate Defendant's Fourth Amendment rights by patting him down and seizing the car keys from

---

[6] The report notes that Defendant does not (and cannot) seek suppression of the shotgun that was tossed by Orlando Potts or the white sock tossed by Johnson. *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); *see also United States v. Sherrills*, 432 F. App'x 476, 482–83 (6th Cir. 2011) (holding that defendant had no privacy interest in items possessed by passengers riding in the vehicle she was driving). Nor does Defendant seek to suppress the blue shirt that he tossed when he saw the officers approaching. *See United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005) (stating that "because a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority, the Fourth Amendment does not apply to anything one may abandon while fleeing the police in an attempt to avoid a seizure").

his pants pocket. The officers had reasonable, articulable suspicion that Defendant had committed

a crime and therefore were authorized to detain him. The Magistrate Judge further concluded that

the officers were justified in conducting a pat-down search and in seizing the keys because the keys

could be used as a weapon. Officer Potts testified that the keys were removed from Defendant's

pocket for officer safety and because the keys might used as a weapon. The Magistrate Judge stated

in the alternative that the keys would have been inevitably discovered. Based on other evidence

including Webster's identification of Defendant, the police had probable cause to arrest Defendant

without the keys. Upon Defendant's arrest, the police would have inevitably discovered the keys

during a search incident to the arrest or even at the police station. The Magistrate Judge went on to

assume that even if Defendant's seizure amounted to an arrest, the officers had probable cause to

arrest Defendant for the carjacking.

Second, the Magistrate Judge stated that the identifications of Defendant were valid. The

Magistrate Judge applied the five *Biggers* factors to assess the reliability of the show-up

identification and concluded that Webster's on-the-scene identification of Defendant as one of his

assailants was reliable. Likewise, the Magistrate Judge reasoned that the photo spread line-up

identification that occurred at the police station was not unduly suggestive. Therefore, the

Magistrate Judge recommended that the Court deny Defendant's Motion to Suppress.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636, the Court may refer a motion to suppress in a criminal matter

to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed

findings of fact and recommendations for the disposition of the motion.[7] The Court must "make a

---

[7] 28 U.S.C. § 636(b)(1)(B).

de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made."[8]  After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.[9]  The Court need not review, under a de novo or any other standard, those aspects of the report and recommendation to which no specific objection is made.[10]  Rather the Court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.[11]

In his objections to the report and recommendation, Defendant specifically objects to the Magistrate Judge's proposed conclusions of law.  Defendant argues that the Magistrate Judge erred in concluding that the pat-down search and the seizure of his car keys did not violate Defendant's Fourth Amendment rights.  Defendant next assigns error to the Magistrate Judge's recommendation that Webster's show-up identification was reliable.  Finally, Defendant objects to the Magistrate Judge's proposed holding that the photo spread line-up identification at the police station was not unduly suggestive.

The government has not filed a response to Defendant's objections or any objections of its own to the Magistrate Judge's report and recommendation.

## ANALYSIS

I.      **Show-up Identification**

---

[8] § 636(b)(1)(C).

[9] *Id.*

[10] *Thomas v. Arn,* 474 U.S. 140, 150 (1985).

[11] *Id.* at 151.

The Magistrate Judge concluded that Webster's show-up identification in which he picked out Defendant and one other person as the two men who had carjacked him was reliable. The Sixth Circuit follows a two-step analysis to consider whether a pre-trial identification violated an accused's Fifth Amendment due process rights: (1) "whether the identification procedure was suggestive," and (2) "if so, whether under the totality of the circumstances, the identification was nonetheless reliable."[12] Due process is implicated when the identification procedure is "unnecessarily suggestive and conducive to irreparable mistake in identification."[13] The Court weighs five factors to determine the reliability of the identification under the "totality of the circumstances": (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness's degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification.[14]

The Court holds that under the totality of the circumstances, the show-up identification in this case was reliable and did not violate Defendant's due process rights. The Sixth Circuit has stated that "[a] showup is inherently suggestive" in light of the fact that "[w]hen only one person is presented to a witness, there is a natural tendency for the witness to feel obligated to provide a positive identification."[15] To the extent that the initial show-up identification on the night of the

---

[12] *United States v. Craig*, 198 F. App'x 459, 466 (6th Cir. 2006).

[13] *Id.* (quoting *Stovall v. Denno,* 388 U.S. 293, 302 (1967)).

[14] *Id.* (citing *United States v. Crozier,* 259 F.3d 503, 510 (6th Cir. 2001)). These are the so-called *Biggers* factors, so-named from the Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188 (1972).

[15] *Summitt v. Bordenkircher*, 608 F. 2d 247, 252 (6th Cir. 1979).

carjacking could be considered suggestive,[16] all of the *Biggers* factors weigh in favor of the conclusion that Webster's on-the-scene identification of Defendant was nevertheless reliable. First, Webster had several minutes in which to view Defendant and Orlando Potts during the carjacking. The evidence shows that Defendant took time to address Webster, telling him to step away from his vehicle and then remove some of his clothing. Webster was able to listen to Defendant's voice and observe the blue shirt wrapped around his head as well as the distinctive shape of Defendant's back and shoulders. Additionally, Webster testified that based on the gunman's voice and a hump on his shoulder, he recognized the gunman as the man who had tried to sell him stereo equipment only one week before. Second, Webster was focused on Defendant throughout the encounter as Defendant was pointing the firearm at Webster, issuing verbal commands to Webster, and, together with Orlando Potts, was the only person with Webster in the store parking lot. Third, Webster provided a detailed, accurate description of Defendant and Potts prior to the show-up identification. Webster had already described the type of weapon the gunman used, the blue shirt the gunman used to cover his face, the sock on the gunman's hand, and the height and build of the gunman and his accomplice.

---

[16] The matter of whether the identification was suggestive is a threshold issue. However, because the Court holds that the show-up identification is reliable under the totality of the circumstances, it declines to address whether the show-up identification here was unduly suggestive. The Court would point out that the cases Defendant has cited in his briefs, finding a show-up identification unduly suggestive, are factually distinguishable from the case at bar. For example, the Sixth Circuit found that a show-up identification was suggestive where the witness was shown "one individual on the side of the road with his hands behind his back, and it [was] clear that the witness believed there was only one individual she was to look at." *United States v. Goist*, 59 F. App'x 757, 760 (6th Cir. 2003) (unpublished). In contrast, the show-up identification in this case involved not one but three suspects, and the witness correctly and immediately identified the two suspects who were involved in his carjacking and indicated that the third suspect was not. Still, because reliability remains the "key criterion in determining the admissibility of [identification] evidence," *Bruner v. Perini*, 875 F.2d 531 (6th Cir. 1989) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)), the Court will focus its analysis on the five *Biggers* factors.

The evidence shows that Webster's descriptions turned out to be accurate. Fourth, Webster demonstrated a high level of certainty when he made his identification of Defendant and Orlando Potts as the men who had carjacked him. The Magistrate Judge correctly pointed out that Webster first confronted Johnson during the show-up identification and stated that he was not one of his assailants, suggesting that Webster did not simply identify Defendant because the police had him in custody. The final factor also weighs in favor of finding the show-up identification reliable; Webster was brought to the scene of the detention approximately one hour after the carjacking had occurred. Under the totality of the circumstances, the Court concludes that Webster's show-up identification of Defendant was reliable. Therefore, the Motion to Suppress is **DENIED** as to this issue.

Next, Defendant challenges the reliability of the subsequent photo spread line-up identification at the police station where Webster also identified Defendant as his attacker. Among the factors the Court must consider to determine whether the photo spread line-up was suggestive are "the size of the [photo] array, the manner of its presentation by the officers, and the details of the photographs themselves."[17] The Supreme Court has stated that the risk of misidentification from a photo line-up increases where (1) "the police display to the witness only the picture of a single individual who generally resembles the person he saw;" (2) the police show the witness "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized;" or (3) "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."[18] In short, an identification based on a photo line-up is

---

[17] *United States v. Stamper*, 91 F. App'x 445, 459 (6th Cir. 2004) (quoting *United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994)).

[18] *Id.* at 460 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

unduly suggestive if the circumstances "steer[ ] the witness to one suspect or another, independent of the witness's honest recollection."[19]

Applying these principles to the facts in this case, the Court holds that the photo line-up was not unduly suggestive. As the Magistrate Judge reported in his undisputed findings of fact, the line-up consisted of six photographs, depicting individuals of similar skin color and age and all wearing red shirts like the one Defendant was wearing when he was arrested and photographed. It is true that two of the photographs were of the same individual (but not Defendant), although one copy was noticeably darker in resolution. However, it cannot be said that this single individual was emphasized. Defendant does not even highlight this defect in the line-up but instead argues that his photograph was distinguishable from the other photographs in the line-up. According to Defendant, he was the only individual pictured without facial hair, and the other individuals pictured appeared to be older and have different haircuts. A photo line-up is not unduly suggestive "merely because the individuals . . . differ in facial characteristics."[20] Rather, different characteristics may be "suggestive where they are striking or relate to an important characteristic of the victim's description."[21] There is no evidence in this case that differences in the characteristics of the individuals in the photo line-up such as facial hair were somehow striking or related in any way to Webster's description of Defendant. Finally, the Court would stress that Webster immediately identified Defendant in the line-up, circling Defendant's photograph and writing at the bottom of the

---

[19] *Williams v. Lavigne*, 209 F. App'x 506, 510 (6th Cir. 2006) (citing *Wilson v. Mitchell,* 250 F.3d 388, 397 (6th Cir. 2001) (other citation omitted)).

[20] *Stamper*, 91 F. App'x at 461 (citing *Grubbs v. Hannigan,* 982 F.2d 1483, 1490 (10th Cir.1993)).

[21] *Id.*

page: "This is the guy that robbed me. I meant [sic] him about a week ago. I reconized [sic] his voice." For these reasons the Court holds that the photo spread line-up was not unduly suggestive. Therefore, Defendant's Motion to Suppress is **DENIED** as to this issue.

## II. Seizure of the Keys

Defendant's remaing objection concerned the Magistrate Judge's recommended legal conclusion that the officers did not violate Defendant's Fourth Amendment rights by patting him down and removing the keys from his pants pocket during the initial detention. Defendant argued in his Motion that police only had probable cause to arrest Defendant for the carjacking once Webster picked him out at the show-up identification. Defendant contends that because the show-up identification was unduly suggestive and unreliable, police lacked probable cause to arrest and search Defendant incident to the arrest. However, the Court has held that the show-up identification was reliable under the totality of the circumstances. To the extent then that Defendant's theory on this issue is based strictly on a supposed defect in the show-up identification, Defendant's argument is without merit. For this reason alone, Defendant's Motion to Suppress must be denied as to this issue.

Defendant has not otherwise argued or shown that the officers lacked probable cause to make the arrest once Webster identified Defendant. The Court concludes that the officers had probable cause to arrest Defendant for the carjacking offense. In this case, the "'facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonable trustworthy information were sufficient to warrant a prudent' person to conclude" that Defendant had committed the

carjacking offense.[22]  The officers had reports that three black males had committed one armed robbery, that they later attempted an armed robbery of a business, and that two black males had committed a carjacking, all in the same area surrounding the Ayoka convenience store adjacent to the Red Oak apartments.  Police also had information that the men involved in the carjacking had blue rags or sweaters covering their faces and that one of the men had a shotgun.  Officer Potts was one of the MPD officers searching the area for these suspects when he observed three black males on foot in the Red Oak apartments, in close temporal and physical proximity to the crimes under investigation.  As Officer Potts approached, one of the males tossed down a shotgun and another tossed a blue shirt.  Under these circumstances, the Officer Potts arguably had probable cause to arrest the three at that point.  Even if probable cause did not exist at the time Officer Potts made initial contact with the suspects, the officers certainly had probable cause once Webster came to the scene of the detention and identified Defendant and Orlando Potts as the carjackers.

Turning then to the seizure of the keys from Defendant's pants pocket, the Court holds that had the keys not been confiscated at the outset of the detention, the police would have inevitably discovered the keys once Defendant was placed under arrest.  Inevitable discovery applies if "the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered."[23]  Put another way, evidence obtained during an illegal search will be admissible if the evidence would have inevitably been discovered

---

[22] *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008).

[23] *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)).

during a subsequent lawful search.[24]  In this case, the Court finds that under the circumstances, the officers would have inevitably discovered the keys in Defendant's pocket once Defendant was arrested.  Police may conduct a "warrantless search of the arrestee's person and the area within his immediate control" incident to an arrest.[25]  Moreover, the search may precede a formal custodial arrest "as long as the formal arrest follows quickly on the heels of the challenged search and the fruits of that search are not necessary to sustain probable cause to arrest."[26]  Based on the other evidence already discussed (including Wesbter's positive identification of Defendant), the Court holds that the officers had probable cause to arrest Defendant even without the keys.  Once under arrest, the officers would have been authorized to conduct a warrantless search of Defendant's person, including his pants pockets, incident to Defendant's arrest.  It is undisputed that the police would have inevitably discovered the keys at that time or during an inventory search of Defendant's personal effects when he was booked into the jail.[27]  Therefore, even if the keys were improperly seized during the detention, a subsequent lawful search of Defendant's person would have resulted in the inevitable discovery of the keys.  As such, Defendant's Motion to Suppress is **DENIED** as to this issue.

Finally, the Court recognizes that the Magistrate Judge offered an alternative justification for

---

[24] *Id.* at 573.

[25] *United States v. McCraney*, — F.3d —, 2012 WL 934020, at *3 (6th Cir. Mar. 21, 2012) (quoting *Chimel v. Calif.,* 395 U.S. 752, 763 (1969) (quotation marks omitted)).

[26] *Id.* (quoting *United States v. Montgomery,* 377 F.3d 582, 586 (6th Cir. 2004) (quotation marks and other citations omitted)).

[27] *United States v. Thomas*, 11 F.3d 620, 628–29 (6th Cir. 1993) (citing *Colorado v. Bertine*, 479 U.S. 367, 370 (1987)).

the seizure of the keys, namely, that Defendant could have used the keys as a weapon and the keys were taken for officer safety. Defendant has not objected to the Magistrate Judge's conclusion that the detention Officers Potts and Joneas initiated was an investigative detention supported by reasonable suspicion of criminal activity. Pursuant to *Terry*, police can stop and briefly detain a person when the police have "reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity."[28] "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."[29] A reasonable suspicion is one "based on specific, objective facts."[30] During an investigative detention, police are permitted to conduct a *Terry* frisk to check for weapons for officer safety.[31] Based on the specific, articulable facts Officers Potts and Joneas had when they first contacted Defendant, the Court holds that they had reasonable suspicion that Defendant had been engaged in criminal activity.

Defendant concedes as much and yet argues that even if the officers had reasonable suspicion to detain him and his cohorts, the officers could not have reasonably believed that the keys could be used as a weapon and had to be seized for officer safety. There is some authority for the proposition

---

[28] *United States v. Smith,* 594 F.3d 530, 536 (6th Cir. 2010).

[29] *Adams v. Williams*, 407 U.S. 143, 145-46 (1972).

[30] *United State v. Williams*, 615 F.3d 657, 666 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

[31] *United States v. Walker,* 181 F.3d 774, 778 (6th Cir.1999) ("[D]uring a *Terry* stop, a police officer may conduct a limited search for concealed weapons, if the officer believes that a suspect may be dangerous.").

that keys may be used as a weapon and therefore are properly seized during a *Terry* stop.[32]  Because

the Court holds that the inevitable discovery rule would apply under the facts of this case, it need not

decide if the seizure of the keys, either as a weapon or as incriminating evidence, was justified.[33]

Therefore, Defendant's Motion to Suppress the keys as evidence is **DENIED**.

<u>**CONCLUSION**</u>

Having conducted a *de novo* review of the portions of the Report to which Defendant has

objected, the Magistrate Judge's Report and Recommendation is **ADOPTED**.  Defendant's Motion

to Suppress is **DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: April 13, 2012.

---

[32] *E.g. United States v. Sutherland*, No. 11-20129, 2011 WL 3796725, at *8 (E.D. Mich. Aug. 25, 2011) ("it is clear to the court that the direction to Sutherland to put down the large bundle of keys in his hand was nothing more than asking him to dispossess himself of something that could be used as a weapon during a *Terry* encounter.").  *But see United States v. Teague*, No. 2:10-CR-006-RWS-SSC, 2010 WL 6529640, at * 15 (N.D. Ga. Nov. 12, 2010) ("[The officer]'s testimony shows that during the pat-down, he immediately recognized the keys as car keys, and there is no evidence that he believed the keys might be a weapon, that he had probable cause to believe they were contraband or indeed that they were contraband.").

[33] *See Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993) (holding that officers may seize contraband other than weapons during a *Terry* frisk if the officer "feels an object whose contour or mass makes its identity immediately apparent").  Here the officers were investigating, among other crimes, a carjacking and under the circumstances, the fact that a suspect possessed (or did not possess) keys on his person would arguably be incriminating (or exculpatory) evidence.  *See United States v. Bustos–Torres,* 396 F.3d 935, 944 (8th Cir. 2005) (holding the "plain feel" exception of *Dickerson* applies to "any incriminating evidence," not just contraband).